IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

JAMES INGRAM,

       Plaintiff,

   v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 15-7710 (JBS)


**<u>OPINION</u>**

---

APPEARANCES:

Lauren S. Tovinsky, Esq.
Jacobs Schwalbe & Petruzelli PC
10 Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
Attorney for Plaintiff

Robert S. Drum, Esq.
Social Security Administration
Office of the General Counsel
P.O. BOX 41777
Philadelphia, PA  19101
Attorney for Defendant.


**SIMANDLE**, District Judge:

## I.   INTRODUCTION

    This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g) (2006), to review the final decision of the Commissioner

of the Social Security Administration denying the application of

Plaintiff James Ingram for Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act. See 42 U.S.C. §§ 401-34 (2006). The principal issue presented is whether the Commissioner's finding that Plaintiff's schizophrenia is sufficiently stable to allow him to perform medium level work functions on a regular and continuing basis is supported by substantial evidence in the record considered as a whole. For the reasons set forth below, the Court will vacate the decision of the ALJ and remand for further proceedings consistent with this opinion.

**II. BACKGROUND**

    **A.** ***Procedural Background***

Plaintiff, James Ingram, protectively filed an initial application for Disability Insurance Benefits ("DIB") on July 16, 2012, alleging an onset date of disability of June 13, 2011, (the "alleged disability onset date") due to paranoid schizophrenia, depression, suicidal ideation, diabetes, and other impairments. (R. 103, 188.) Plaintiff's application was denied both initially and on reconsideration. (R. 140-44, 146-48.)

On March 21, 2013 Plaintiff requested a hearing before an Administrative Law Judge. (R. 149-40.) The hearing commenced on May 12, 2014, in Pennsauken, New Jersey, before the Honorable Nicholas Cerulli, ("the ALJ") and Plaintiff was represented by counsel. (R. 37-85.) Louis P. Szollosy, a vocational expert,

also appeared and testified. (Id.) In a written opinion dated August 5, 2014, the ALJ determined that Plaintiff was "not under a disability" within the meaning of the Act from June 13, 2011 through the date of the decision and was therefore not entitled to benefits. (R. 16-32.) Specifically, the ALJ found that although Plaintiff had severe, medically-determinable impairments, he remained capable of a limited range of medium work. (Id.)

Plaintiff filed a timely request for review by the Appeals Council on August 5, 2014. (R. 1.) The Appeals Council denied the request on October 6, 2014, making the ALJ Denial the final decision of the Commissioner of Social Security. (R. 1-6.) The present action was timely filed by Plaintiff on November 2, 2015 in the United States District Court for the District of New Jersey claiming that the Commissioner's finding that Plaintiff is "not disabled" was not based on substantial evidence. Specifically, Plaintiff alleges that the ALJ failed to properly assess his Residual Function Capacity ("RFC") because he failed to properly account for the true extent of Plaintiff's physical and psychiatric limitations. (Pl. Br. at 14-15.)

### B. *Factual Background*

Plaintiff was 58 years old at the alleged disability onset date and 61 years old on the date of his disability hearing. (R. 31, 44.) He has a General Equivalency Diploma (GED), the

equivalent of high school education. (R. 208.)

From November 2012 until October 2013, Plaintiff drove a bus and car for First Transit, working 35 hours per week at $15.00 an hour. (R. 50, 53-54.) According to the Vocational Expert ("VE"), this job was classified as a "semiskilled medium occupation." (R. 73-74.) He had to resign from the position in April 2013, after he was found ineligible for a Commercial Driver's License due to his diagnosis of paranoid schizophrenia. (R. 21; 46-47; 430.) In the past, Plaintiff had worked as a parts clerk and parts delivery driver (R. 53-55), which the VE classified as "semiskilled" and with duties ranging from "light to medium exertion." (R. 74, 208.) He also worked as a yarn twister, a "medium exertion semiskilled occupation," and as an eyeglass assembler, a "light semiskilled" occupation. (R. 53-55, 74, 208.) Plaintiff testified that at his eyeglass assembler job, Plaintiff's employer told him he was performing too slowly in the number of glasses he was able to assemble. (R. 72.)

Between 2011 and 2012, Plaintiff received Worker's Compensation benefits. (R. 51.) He certified that he was "ready, willing, and able to work." (R. 51-52.) As part of receiving his benefits, Plaintiff had to show that he was looking for work, and he reported applying for jobs at stores such as Home Depot, McDonald's, and local convenience stores. (R. 52.)

### 1. <u>Plaintiff's Psychological Impairments</u>

Plaintiff testified that he was disabled because of episodes of schizophrenia. (R. 28, 55.) He stated he was paranoid when driving in heavy traffic and had delusions. (R. 46.) He reported an incident where he brought a chainsaw and shovel into his house because he believed there were people coming to hurt his family. (R. 28-55.) Plaintiff's psychiatric problems reportedly began in 2003, when he began to develop paranoid ideation and other psychotic features. (R. 404). His mother is also diagnosed with schizophrenia (R. 404). The medical evidence reveals the following:

> (a)  *June 15, 2011 – Hospitalization at Hampton Behavioral Health Center*

Records from the Hampton Behavioral Health Center show that on June 15, 2011 Plaintiff was voluntarily hospitalized due to paranoid delusions and auditory hallucinations, with the belief that people were trying to poison him. (R. 292, Ex. B5F.) It was reported that prior to admission, Plaintiff had barricaded himself in the basement of his home. (Id.) At the time of admission, the medical record indicates that Plaintiff's thought content was positive for paranoid delusions, his affect was constrictive and insight poor. (R. 292-293.) His Global Assessment of Functioning ("GAF") was estimated to be 20, which according to the Diagnostics and Statistics Manual of Mental Disorders ("DSM-IV") indicated Plaintiff had a "gross

impairment."[1] (Id.) Plaintiff was started on medication, namely
Seroquel, and eventually switched to Risperdal. (R. 295.) After
three weeks on medication Plaintiff's paranoia improved and by
the time of discharge on July 6, 2011 he was reported to be in
stable condition, in a good mood, and with an affect in
congruence with his mood. (R. 295.) On discharge, he reported no
auditory hallucinations and only mild paranoid delusions. (Id.)
His discharge records diagnosed Plaintiff with "schizophrenia,
paranoid type." (Id.). His GAF score at that time was 55, which
indicated moderate symptoms or a moderate impairment in social
or occupational functioning.[2] (Id.) Plaintiff was discharged home
with a prescription of Risperdal. (Id.).

From July 7, 2011 to August 11, 2011 Plaintiff participated
in an Adult Partial Hospitalization Program at the Hampton
Behavioral Health Center. (R. 300-301.) He participated in group
psychotherapy, psychoeducation groups, and medication education

---

[1]The GAF scale ranges from zero to 100 and "[c]onsider[s] the
psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness." DSM-IV. A GAF
score of 11 to 20 denotes "some danger of hurting self or others
(e.g., suicide attempts without clear expectation of death;
frequently violent; manic excitement) OR occasionally fails to
maintain minimal personal hygiene (e.g., smear feces) OR gross
impairment in communication (e.g., largely incoherent or mute)."
Def. Opp. at 7 n.3 (citing DSM-IV at 32).
[2] A GAF score of 51 to 60 indicates that the individual has
"[m]oderate symptoms . . . or moderate difficulty in social,
occupational, or school functioning. . . ." Def. Opp. at 7 n.3
(citing DSM-IV at 32.)

and management. (R. 300.) At discharge from this program, it was reported that his mood and thought processes were stable and that he was motivated to participate in his follow-up care. (R. 300.) His GAF score was still 55, indicating moderate symptoms. (R. 300.)

>    (b)  *June 12, 2012 – Emergency Room visit at Kennedy Health System*

On June 12, 2012 Plaintiff was seen at the emergency room at Kennedy Health System. (R. 302.) He reported having racing thoughts and difficulty sleeping at night, but denied having auditory or visual hallucinations, or suicidal or homicidal ideation. (Id.) Plaintiff was given Augmentin and Remeron and referred to outpatient treatment. (R. 306.)

>    (c)  *June 18, 2012 – Hospitalization at Kennedy Health System*

On June 18, 2012, Plaintiff was hospitalized at Kennedy Health System. (R. 314.) At admission, he reported having racing thoughts, an inability to sleep, and no energy. (R. 314, 325.) He reported being depressed for the past two weeks, and had suicidal ideation with a plan to cut himself with a knife. (R. 325.) Plaintiff denied having hallucination or delusions, and it was reported that his thought processes were normal. On admission, his GAF score was 30, indicating "serious impairment"

or "serious symptoms."[3] (R. 325.) Medication for his schizophrenia was changed to Seroquel and he was given medication for his insomnia. (R. 315.) Plaintiff was discharged after one week, on June 25, 2012. (R. 315.) At discharge, he reported no suicidal or homicidal thoughts, no hallucinations, and no paranoia. (Id.) His discharge diagnoses were schizophrenia – chronic, paranoid type – and a depressive disorder, (R. 314.) His GAF score at the time of discharge was 62, which indicated mild symptoms and generally good functioning.[4]

> (d)  November 20, 2012 – Social Security Disability
>       Consultative Examination by Dr. Bogacki

On November 20, 2012, Dr. David Bogacki, Ph.D., conducted a consultative mental status examination at the request of the Commissioner. (R. 22, 404-405.) Dr. Bogacki's report noted that Plaintiff had five hospitalizations from 2004-2011 due to his schizophrenia. (R. 404.) The evaluation stated that Plaintiff

---

[3] GAF scores of 21 through 30 denote "behavior is considerable influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Def. Opp. at 9 n.4 (citing DSM-IV at 32).

[4] GAF scores of 61-70 denote "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Def. Opp. at 10 n. 5 (citing DSM-IV at 32.)

reported that he took care of his own personal needs, helped with household chores, drove a car, and was able to use public transportation (R. 405.) Plaintiff also reported having friends that he could relate to and attended church. (Id.) Dr. Bogacki observed that Plaintiff was neatly dressed and groomed, and oriented to time, place, and person. (Id.) Plaintiff's affect and mood were noted to be in normal limits, and his speech was logical, coherent, and goal-oriented. (Id.) Dr. Bogacki did not note any psychotic symptoms and said Plaintiff had reported that despite occasional bad dreams, he had been "totally symptom-free" for the past five months. (Id.) Dr. Bogacki diagnosed Plaintiff with schizophrenia paranoid type, chronic, in remission. (Id.) He estimated Plaintiff's current GAF score at 70, and his highest over the past year around 65. (Id.)

> (e)  *January 17, 2013 – Emergency Room Visit at Kennedy Health System*

Plaintiff was seen at the emergency room at Kennedy Health System for a "crisis evaluation" on January 17, 2013, reporting increased depression and paranoia. (R. 416.) Plaintiff reported that he was hearing voices, but had no command hallucinations or suicidal or homicidal ideations. (Id.)

> (f)  *January 18, 2013 – Hospitalization at Hampton Behavioral Health Center*

Following the emergency room visit the previous day, Plaintiff was voluntarily hospitalized at Hampton Behavioral

Health Center on January 18, 2013, following a two to three day episode of paranoia. (R. 408.) Plaintiff reported he felt people were out to harm him and play tricks on him. (Id.) He denied auditory or visual hallucinations, but reported hearing sporadic voices. (Id.) Plaintiff reported that he was currently working for a transit company and had been married for 12 years. (Id.) The admission mental status examination noted that Plaintiff appeared well groomed and cooperative, his thoughts were logical, and he had normal thought content. (R. 409.) He was diagnosed with schizophrenia, paranoid type (R. 409) His admission GAF score was 30. (Id.) While hospitalized, a reviewing doctor, Dr. Charles Trigiani, reported that Plaintiff could not recognize his own paranoia. (R. 410). Dr. Trigiani also noted that he agreed with Plaintiff's request for a period of disability leave prior to returning to work. (R. 410). The discharge notes report that Plaintiff responded well to changes in medication and that while he was leaving "prematurely" he was stabilized enough. (R. 411.) Plaintiff was discharged on February 5, 2013, and at the time of his discharge, his GAF score was 55, indicating moderate symptoms. (Id.)

> (g)  *February 7, 2013 – Intensive Outpatient Program, Hampton Behavioral Health Center*

Plaintiff participated in the Adult Intensive Outpatient Program at Hampton Behavioral Health Center from February 7,

2013 to February 18, 2013. (R. 413-414.) Treatment included participation in psychotherapy, psychoeducational groups, and medication education and management. (R. 413.) It was reported that during treatment, Plaintiff was motivated, compliant with treatment goals, and successfully completed the program. (Id.) His discharge notes reported that at the time of discharge, Plaintiff was stable in mood and thought and his GAF score was 75, indicating minimal symptoms. (413-414.)[5]

> (h)  April 2014 – Disability Hearing

At the time of the hearing in April 2014, Plaintiff reported no new psychotic episodes. He was still prescribed 300 mgs. of Seroquel to help control his psychotic symptoms, but reported that he still experienced some symptoms of his schizophrenia as well as side effects from the medication, such as drowsiness, nausea, and weight gain. (R. 28, 56.) Plaintiff testified that he has difficulty with his memory and concentration. (R. 63-64.) He testified that his wife helps him remember his medications (R. 64), that he has difficulty following a conversation and will often forget the topic in the

---

[5] GAF scores of 71-80 denote "no more than slight impairment in functioning at home, at school or with peers. Some disturbance of behavior or emotional distress may be present in response to life stresses (e.g., parental separations, deaths, birth of a sibling) but these are brief and interference with functioning is transient." Def. Opp. at 10 n. 6 (citing DSM-IV at 32).

midst of conversations (R. 64), and that in church he has difficulty following along with the service. (R. 68-70.) Plaintiff testified he could stay focused for around an hour. (R. 64-65.) Plaintiff testified that he does not socialize much. (R. 65, 72.) He noted that other than church he does not interact with other people. (R. 72.)

### 2. Plaintiff's Physical Impairments

Plaintiff is diagnosed with renal cysts, diabetes mellitus, and hypertension. (R. 399.) He was diagnosed with diabetes and hypertension in 2005 (R. 399.), and with renal cysts in 2012. (R. 383, 469.) Plaintiff testified that he has trouble standing for extended periods of time, often needing to take breaks when washing dishes. (R. 65.) He also stated he has trouble climbing the stairs in his two-story residence. (R. 65.) Plaintiff testified he has trouble caring for some of his personal needs. He wets the bed some nights (R. 66) and has difficulties taking baths and showers. (R. 67.) The pertinent medical evidence is as follows:

> *(a) November 5, 2012 – Social Security Consultative*
> *Examination by Dr. Wilchfort*

On November 5, 2012, Dr. Samuel Wilchfort conducted a consultative examination at the request of the Commissioner. (R. 399.) Dr. Wilchfort noted that Plaintiff had normal range of motion in his upper and lower extremities, and was able to bend

over to 90 degrees. (R. 401.) He also noted that Plaintiff was able to perform straight-leg raises to 80 degrees, heel and toe walks, and squats. (R. 399, 401.) Plaintiff was reported as having normal sensation, and that his reflexes and muscle strength showed no signs of weakness. (R. 401.)

### (b) January 17, 2013 – Emergency Room Visit at Kennedy Health

On January 17, 2013, Plaintiff was seen at the emergency room of Kennedy Health System complaining of moderate abdominal pain and nausea, as well as possible hernia and renal cysts. (R. 490.) A CT scan of his abdomen showed a cyst in his right kidney and hyper dense lesion in the left kidney indicating potential small hemorrhagic cysts. (R. 498.) The reviewing doctor reported that his impressions were probable bilateral renal cysts. (R. 422.) Plaintiff was prescribed Zofran for nausea and subsequently discharged. (R. 531.)

### (c) March 14, 2014 – Delaware Valley Urology Evaluation

In March, 2013, an ultrasound of the kidney revealed Plaintiff had bilateral renal cystic lesions. (R. 461-462.) Treatment notes indicate Plaintiff was diagnosed with benign prostatic hyperplasia, a renal cyst, nocturtia, erectile dysfunction, and hypogonadism. (R. 484.) The main complaint by Plaintiff was frequent urination. Plaintiff was prescribed Andro

Gel pump for low testosterone, and a three month follow-up. (R. 484.)

> (d)  April 18, 2014 – Dr. Richard Simon Evaluation

On April 18, 2014, Plaintiff's treating physician, Dr. Richard Simon, conducted a physical evaluation in conjunction with Plaintiff's disability hearing. Dr. Simon reported that Plaintiff could sit for a total of three hours in an eight hour workday; stand for a total of one hour in an eight hour workday; and could not walk at all during an eight hour workday. (R. 458.) He further reported that Plaintiff could only occasionally bend, stoop, crawl, squat, climb or use his feet for foot controls. (Id.) Dr. Simon checked off that Plaintiff could lift and carry up to ten pounds occasionally, and up to five pounds frequently. (Id.) His examination report stated that Plaintiff's pain was severe enough to be distracting to adequately perform daily activities or work; and that side effects from his medications could be expected to limit Plaintiff's effectiveness of work duties, or the performance of everyday tasks. (Id.)

C. **The Commissioner's Decision**

Applying the requisite five-step analysis, the ALJ concluded that Plaintiff did not initially meet the insured status requirement because Plaintiff had engaged in substantial gainful activity from November 2012 through October 2013 when he worked full-time as a bus driver. (R. 21.) Plaintiff argued that

this was a trial work period, but the ALJ stated that Plaintiff was not entitled to a trial work period because such a period requires a finding that Plaintiff was disabled, which had never previously been determined. (R. 21.) The ALJ observed, however, that there was a continuous 12-month period when Plaintiff did not engage in substantial gainful activity beginning in October 2013, and accordingly, determined that Plaintiff had met the disability insured status requirements from that date only. (R. 21.)

At step two, the ALJ determined that Plaintiff had severe medical impairments resulting from: degenerative disc disease, diabetes mellitus, hypertension, a renal cyst, obesity, a major depressive disorder, schizophrenia, and delusional disorder. (R. 21.)

At step three, however, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met, or medically equaled the severity of one of the Listed Impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (R. 25.) Furthermore, based on his findings the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform "medium work" as defined in 20 C.F.R. 404.1567(c). In making these findings, the ALJ found that Plaintiff's reported restrictions were "not fully persuasive to the disabling extent alleged, when considered with the totality of the medical

evidence of record." (R. 30.)

After performing the RFC assessment, the ALJ determined that Plaintiff was unable to perform any past relevant work since such work exceeded his RFC, as confirmed by the vocational expert. (R. 30.) Furthermore, the ALJ concluded that Plaintiff was "an individual of advanced age" as of the alleged disability onset date, had at least a high school education and was able to communicate in English. (R. 31.)  He further determined that transferability of job skills was immaterial to his determination under the Medical-Vocational Rules. (R. 31.)

Then, considering Plaintiff's age (58 years old as of the alleged disability onset date), education, work experience, and RFC of "medium work" as determined, in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ found that there were jobs that existed in the national economy that Plaintiff could perform. (R. 31.) The ALJ further recognized that because of additional limitations, Plaintiff did not have the ability to perform all or substantially all of the requirements of medium level work as directed by Medical-Vocational Rule 203.15 and 203.07. Thus, the ALJ asked a vocational expert to determine the extent to which the additional limitations erode the unskilled medium occupational base as applied to Plaintiff. (R. 31.) The vocational expert testified that given Plaintiff's RFC factors,

Plaintiff would be able to perform the requirements of occupations such as assembler, laundry worker, or housekeeper, which exist in significant numbers in the national economy. (R. 31-32.) Thus, Plaintiff's application for DIB was denied. (R. 32.)

## III. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), Congress provides for judicial review of a Commissioner's decision to deny a complainant's application for Social Security benefits. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (Id.) The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality. See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). However, a district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)). The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000). Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him. Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981)).

The Third Circuit has held that access to the Commissioner's reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978). However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision. See Fargnoli, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards. Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

**B. Disability Defined**

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Under this definition, a plaintiff qualifies as disabled,

> only if his physical or mental impairment or
> impairments are of such severity that he is

> not only unable to do his previous work but
> cannot, considering his age, education, and
> work experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy
> exists for him, or whether he would be hired
> if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that – (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. This definition presupposes a regular, continuing, and sustained ability to perform such work. Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520. The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as follows:

> 1. If the plaintiff currently is engaged in substantial gainful employment, the plaintiff is "not disabled."
>
> 2. If the plaintiff does not suffer from a "severe impairment," the plaintiff is "not disabled."
>
> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is

expected to last for a continuous period of at
least twelve months, the plaintiff is
"disabled."

4. If the plaintiff can still perform work the
plaintiff has done in the past ("past relevant
work"), despite the severe impairment, the
plaintiff is "not disabled."

5. Finally, the Commissioner will consider
the plaintiff's ability to perform work
("residual functional capacity"), age,
education, and past work experience to
determine whether or not the plaintiff is
capable of performing other work which exists
in the national economy. If the plaintiff is
incapable, a finding of disability will be
entered. On the other hand, if the plaintiff
can perform other work, the plaintiff will be
found to not be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

## C. Analysis

Plaintiff argues that the ALJ erred in his assessment of
the severity of Plaintiff's psychological impairments by failing
to fully weigh and consider the medical evidence of record,
namely the opinion of Plaintiff's treating physician, Dr. Simon;
finding Plaintiff less than fully credible; and failing to
analyze all evidence relating to Plaintiffs' severe impairments
in fashioning an RFC. For reasons next explained, the Court
agrees that the ALJ erred in his assessment of Plaintiff's
credibility and his ultimate RFC determination by (1) failing to
properly explain how Plaintiff's repeated hospitalizations due
to his schizophrenia could be reconciled with the ALJ's

determination that Plaintiff could perform medium work on a
regular and continuous basis; and (2) relying on reports that
Plaintiff was "stable" as indicating a reliable measure of
Plaintiff's ability to perform medium work functions on a
regular and continuing basis, without reconciling significant
evidence to the contrary. As such the Court cannot find that the
Commissioner's finding is supported by substantial evidence, and
the Court will remand for resolution. See Fargnoli v. Massanari,
247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting
probative evidence in the record, we recognize a particularly
acute need for an explanation of the reasoning behind the ALJ's
conclusions, and will vacate or remand a case where such an
explanation is not provided.").

The Court will consider together Plaintiff's argument that
the ALJ failed to properly account for the true extent of
Plaintiff's psychiatric impairments in fashioning the RFC, and
Plaintiff's complaint that the ALJ erred in his credibility
determination of Plaintiff in regards to the severity of those
same impairments.

RFC is what a person is still able to do despite the
limitations caused by his impairments. 20 C.F.R. §§ 404.1545(a)
and 416.945. Social Security Ruling 96-8p dictates that the RFC
assessment is a "function-by-function assessment based upon all
of the relevant evidence of an individual's ability to do work-

related activities." SSR 96-8p (emphasis added). In order to meet the requirements of SSR 96-8p, the ALJ "must specify the evidence that he relied upon to support his conclusion," Pearson v. Barnhart, 380 F. Supp. 2d 496, 506 (2005), as well as an explanation of "how he factored in evidence that arguably pointed to the opposite conclusion." Morrison ex rel. Morrison v. Comm'r. of Social Sec., 268 Fed. Appx. 186, 187 (3d Cir. 2008); Burnett v. Comm'r, 220 F.3d 112, 119–20 (3d Cir. 2000). While the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), the ALJ findings must be "comprehensive and analytical" and "include a statement of subordinate factual foundations on which ultimate factual conclusions are based." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) (quoting Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974), cert denied. 420 U.S. 931 (1975).

This Court agrees that the ALJ's determination failed to adequately explain important and recurring evidence in the record that conflicts with his finding that Plaintiff's psychological impairments are "stable" and can thus perform medium level work on a regular and continuous basis. First, the parenthetical string cite to supporting evidence in the ALJ's determination, see R. 29 ("The medical evidence of record indicates that the claimant's schizophrenia has been in

remission and is stable,") is by no means a "comprehensive and analytical," explanation as required to satisfy SSR 96-8p. <u>Cotter</u>, 642 F.2d at 705. The record he cites as evidence provides only a partial picture, failing to cite to other places in the record that squarely contradict his ultimate conclusion that Plaintiff's schizophrenia is stable enough for him to perform medium level work on a regular and continuous basis. Second, the ALJ gave improper weight to citations in the record where Plaintiff was found to be "stable." (<u>See</u> R. 29, stating that "the medical evidence of record indicates that the claimant's schizophrenia has been in remission and is stable," and noting that Plaintiff was "stable on Seroquel.") The label of "stable" is not used as a uniform measure throughout the medical record, and is therefore not a reliable indicator of Plaintiff's ability to perform work functions on a regular and continuing basis as part of his RFC assessment. Since the ALJ does not explain or even acknowledge such discrepancies between his findings and the medical record, the Court finds the ALJ's decision is not based on substantial evidence. Remand is thus appropriate.

1. **<u>The Commissioner failed to consider all relevant medical evidence or explain evidence he dismissed.</u>**

In coming to his conclusion that Plaintiff's psychiatric limitations are not as severe as Plaintiff himself reports, the

ALJ provides a parenthetical string cite to the exhibits only, with no further explanation. The exhibits he cites, with the Court filling in the missing descriptions, are as follows:

i. **Discharge Summary from Hampton Counseling Center** on August 8, 2011, which notes that Plaintiff was "stable in mood and thought" *after a one month long* intensive Adult Partial Hospitalization Program that ran from 9:00 a.m. to 3:00 p.m. five days a week and included participation in group psychotherapy, psychoeducational groups, medication education, medication management and individual sessions. (R. 300, Ex. B6F)(emphasis added).

ii. **Disability Evaluation Mental Status Examination** on November 20, 2012 by Dr. Bockacki, the psychiatrist who evaluated Plaintiff at the request of the Commissioner. Exam reported that Plaintiff exhibited no psychotic symptoms and diagnosed him with "schizophrenia paranoid type, chronic *in remission*." (R. 405, Ex. B13F at 2.)

iii. **Discharge Summary from Hampton Counseling Center** on February 18, 2013 that reported Plaintiff "presented as stable in mood and thought" upon discharge from an almost month long Adult Intensive Outpatient program that ran three days a week from 9:00 a.m. to 12:30 p.m. and included participation in group psychotherapy, psychoeducational groups, medication education and medication management. The discharge notes diagnosed him with "schizophrenia, paranoid type" and referred him to a psychiatrist for medication management for his "psychosis." (R. 413, Ex. B16F at 1.)

iv. **DOT medical examination by Dr. Brahman Levy** on October 15, 2013 indicating that   Plaintiff was "stable." (R. 440, Ex. B20F at 11.)

v. **Examination by Dr. Krawl**, Plaintiff's treating psychiatrist, on October 28, 2013 reported that Plaintiff's schizophrenia is "stable." (R. 446, Ex. B21F at 2.)

vi. **Examination by Dr. Krawl** on November 18, 2013 noting that after his recent discharge Plaintiff was stable. (R. 541, Ex. 24F at 5.)

The ALJ's determination thus failed to provide a thorough treatment of the medical record he cites (the aforementioned exhibits) and did not provide a sufficiently reasoned

explanation for his failure to do so. "The ALJ must consider *all* the evidence and give some reason for discounting the evidence she rejects." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(internal citations omitted)(emphasis added). An ALJ is required to provide "not only an expression of the evidence he considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Cotter, 642 F.2d at 705.

    In fulfilling our obligation to determine if the record is supported by "substantial evidence," this Court finds that the ALJ has not considered all relevant factors and sufficiently explained his conclusion that Plaintiff's schizophrenia is stable enough to permit him to perform medium-level work functions on a regular and continuing basis. The ALJ cites only to those exhibits, or only specific portions of an exhibit, that bolster his conclusion, while failing to explain the evidence that seemingly contradicts. For instance, the ALJ's citation to Plaintiff's Discharge Summaries on August 8, 2011, and February 18, 2013, which stated Plaintiff was "stable in mood and thought," fails to address the fact that this "stability" came after two separate *month long intensive hospitalization programs* that included multiple days a week of group psychotherapy,

psychoeducational groups, medication education and management, and individual psychotherapy sessions. (R. 300, Ex. B-6F; R. 413, Ex. B-16F.) "Citing to only portions of an exhibit while failing to address other portions of that very exhibit that contradict the ALJ's findings will not suffice." Sullivan v. Comm. of Social Sec., No. 12-7668, 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013). Serial bouts of schizophrenia accompanied by psychotic episodes, interrupted by periods of hospitalization and temporary remission of symptoms, do not support a finding of stability on a regular and continuing basis.

Additionally, in the single paragraph he devotes to discussing Plaintiff's psychiatric impairments in relation to the RFC determination, the ALJ relies almost exclusively on the consultative exam of Dr. Bogacki. At the time of the exam, November 12, 2012, Dr. Bogacki determined Plaintiff's schizophrenia was in remission, yet fewer than two months later Plaintiff was seen at the emergency room for a "crisis evaluation" because he was hearing voices and experiencing increased depression and paranoia. (R. 404-405; 416.) That same month, Plaintiff was admitted for in-patient care because of a multi-day episode of paranoia where he reportedly believed people were out to harm him and play tricks on him. (R. 408.) Nowhere in his opinion does the ALJ acknowledge that such evidence of psychological instability undermines Dr. Bogacki's

finding that Plaintiff's schizophrenia was in remission, or explain how this evidence can be reconciled with the ALJ's own conclusion that Plaintiff's schizophrenia is stable. "When a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429; see also Landeta v. Com'r, 191 F. App'x. 105, 110 (3d Cir. 2006) ("An ALJ errs by failing to address evidence in direct conflict with his findings.").

Furthermore, the ALJ cites to the DOT medical examination by Dr. Levy on October 15, 2013 indicating that Plaintiff was "stable." Yet the ALJ fails to address that Dr. Levy specifically states "stable as to above 3 problems," yet only lists "hypertension, diabetes mellitus, [and] major depression," with *no reference whatsoever* to Plaintiff's schizophrenia. (R. 440, Ex B-20F at p.11.) And finally, as to the last piece of evidence in the string cite, the examination by Dr. Krawl on November 18, 2013 noting that Plaintiff was "stable," the ALJ fails to acknowledge that Dr. Krawl's subsequent notes on March 19 and April 28, 2014 diagnosing Plaintiff with "delusional disorder" make no mention of Plaintiff being stable. (R. 537-541, Ex. 24-F.) It is obvious that the ALJ has not reconciled these critical and undisputed medical findings of ongoing schizophrenia and psychosis with his ultimate conclusion that Plaintiff is capable of performing medium work on a regular and

continuous basis. "While an ALJ need not cite all evidence where such evidence is irrelevant/not probative, it is clear that he 'may not reject pertinent or probative evidence without explanation.'" See Sullivan, 2013 WL 5973799, at fn. 5 (citing Johnson, 529 F.3d at 205).

## 2. The Commissioner gave improper weight to inconclusive evidence without explanation

The ALJ gives exclusive weight to the record's finding of "stability" without reconciling the contradicting evidence that shows a finding of "stable" is not a reliable measure of Plaintiff's psychological capabilities or ability to perform gainful employment. A finding of "stable" throughout the record is not used as a uniform measure of Plaintiff's ability to perform work functions on a regular and continuing basis as part of the RFC assessment required by SSR 96-8p. Without explanation by the ALJ, the same facts that are cited as being strong indicators that Plaintiff's schizophrenia was "stable," namely, Dr. Bogacki's observation that Plaintiff was "oriented in time, place, and person with normal memory, affect, insight, and concentration," were also reportedly present when Plaintiff was *in the midst* of a psychotic episode. For instance, when Plaintiff was hospitalized at Hampton Behavioral Center on January 18, 2013 following a multi-day episode of paranoia that included hearing sporadic voices, Plaintiff's admission mental

status exam noted that he was "cooperative," with "logical thoughts," and exhibited "normal thought content." (R. 409.) Moreover, at discharge for this same period of hospitalization, on February 5, 2013, the discharge doctor, Dr. Trigiani, reported Plaintiff as "stabilized" yet still noted that he believed Plaintiff's request to leave was "premature." Thus indicating that a psychiatric label of "stable" does not necessarily carry the same fixed meaning as the ALJ grants it in the applicable context of a sustained ability to perform gainful employment.

This Court may not substitute its conclusions for those of the ALJ if the latter are supported by substantial evidence and in accordance with the governing statutes and regulations. The ALJ should have the opportunity to consider and further develop the record. Thus, on remand, the ALJ should address his ultimate RFC and credibility assessments, and explain why the findings of "stable" he cites to can be reliable measures, and provide a more thorough treatment and explanation for doing so, or, indeed, reach a different conclusion after such re-examination. See Fargnoli, 247 F.3d at 43 ("Although the ALJ may weigh the credibility of evidence, he must give some indication of the evidence he rejects and his reason(s) for discounting that evidence.").

These tasks on remand are dictated by well-established

precedent. Particularly given "the special nature of proceedings for disability benefits, [the Court] dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence. Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). It is more than just common sense that missing extended periods of work due to psychiatric hospitalization will surely affect one's ability to maintain a job on a regular and continuous basis. While it is not this Court's role to decide what evidence to credit, it is the Court's duty to demand that an ALJ "consider all the evidence and give *some reason* for discounting that which [he] rejects." Masher v. Astrue, 354 F. Appx. 623, 627 (3d Cir. 2009)(emphasis added). As stated in Dobrowolsky, 606 F.2d at 407.

> Unless the [ALJ] has analyzed *all* evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

While the ALJ might reach the same result on remand, a more thorough explanation dealing with conflicting evidence is needed.

## IV. CONCLUSION

For the reasons stated above, this Court finds that the ALJ's RFC determination that Plaintiff can perform medium level work is not supported by substantial evidence. The Court will

thus vacate the decision of the ALJ and remand. An accompanying

Order will issue this date.


**November 17, 2016**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
United States District Judge